762

Fernando García, demandante y apelado, v. The American Railroad Company of Puerto Rico, demandada y apelante. Rosa Feliú Vda. de Rodríguez, demandante y apelada, v. La Misma, demandada y apelante. Pedro Mercado, demandante y apelado, v. La Misma, demandada y apelada. Francisco Olmeda, demandante y apelado, v. La Misma, demandada y apelante.

No. 5451.—*Sometido:* Noviembre 15, 1932. *Resuelto:* Noviembre 28, 1933.

*M. Acosta Velarde,* abogado de la apelante; *O. Souffront* y *M. Ramírez Baigés,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

La demandada, American Railroad Company of Puerto Rico, explota un servicio de trenes que cruza la isla de norte a sur y conecta, entre otras, las poblaciones de Lajas y Yauco, a través de cuya vía y como a un kilómetro de distancia del pueblo de Lajas, se extiende una carretera que los demandantes califican de pública y la demandada de camino privado. En la intersección hay un paso a nivel.

En 29 de octubre de 1928, como entre tres y media y cuatro

de la tarde, ocurrió una colisión entre un tren de la compañía demandada y un autocamión marca "Graham". El autocamión pertenecía a Fernando García, y en el momento del accidente iban en él cuatro personas: el *chauffeur* Francisco Olmeda, Ernesto Rodríguez, Pedro Mercado y Carlos Seda. Ernesto Rodríguez pereció en el accidente. Pedro Mercado y Olmeda fueron heridos y el autocamión quedó casi totalmente destrozado. Se iniciaron cuatro pleitos contra la American Railroad Co. y la corte de distrito dictó sentencia en favor de todos los demandantes.

■ Se alega en primer término que la corte erró al declarar sin lugar una moción para eliminar presentada por la apelante contra las demandas enmendadas. No damos importancia a este supuesto error, que resulta además insuficiente. La corte inferior se negó a eliminar conclusiones de derecho basadas en los hechos aducidos en la demanda y el error, en caso de que exista, no ha podido ocasionarle perjuicio alguno.

■■ Los errores segundo, tercero, y cuarto se relacionan con la negligencia atribuída a la demandada por no haber colocado cadenas o barreras en el sitio donde ocurrió el accidente y tener allí un empleado para dar aviso de la aproximación de los trenes a las personas que por allí cruzaban. Estos errores, que discutiremos conjuntamente, dicen así:

"Error 2. La sentencia de la corte, al condenar a la demandada por el fundamento de que el sitio del accidente es el de un cruce de vía férrea con carretera pública insular, priva a la demandada de su propiedad, sin un debido proceso de ley y sin la debida compensación, violando por tanto el artículo 2 del Acta Orgánica de Puerto Rico y la enmienda quinta de la Constitución de los Estados Unidos de Norte América.

"Error 3. La corte cometió manifiesto error al dictar sentencia en contra de la apelante y sostener que la demandada venía obligada por ley a tener en el sitio del accidente cadenas o barreras y poner empleado o vigilante para dar aviso de la aproximación de los trenes a las personas o vehículos que cruzaran o pudieran cruzar las vías por el citado cruce o paso a nivel.

"Error 4. La corte erró al dictar sentencia por el fundamento de que la demandada no tenía en el sitio del accidente medio alguno de dar aviso de la aproximación de los trenes."

La prueba demuestra que el vehículo guiado por Francisco Olmeda se dirigía a Lajas descendiendo suavemente y después de doblar una curva continuó caminando a una velocidad moderada hasta penetrar en el cruce donde chocó con el tren de la demandada que venía de Lajas. Las declaraciones de los testigos y las fotografías tomadas en el sitio del accidente demuestran que había en la vía un terraplén y arbustos que impedían ver por lo menos hasta una distancia cerca del cruce. La corte inferior, en el párrafo octavo de su opinión, dice que la locomotora caminaba a la velocidad acostumbrada y que tocó los pitos de costumbre, y luego, en el párrafo noveno, dice que la negligencia de la demandada fué la causa próxima del accidente, al dejar de cumplir con el inciso q del artículo 3 de la Ley No. 70 de 1917 ( [2], pág. 433), y al haber dejado asimismo de dar aviso conveniente y adecuado al demandante Francisco Olmeda de la aproximación del tren al paso a nivel donde ocurrió el accidente, teniendo en cuenta las condiciones del cruce y la falta de protección en el mismo, y haber dejado dicha demandada de observar todas las precauciones que la ley y las condiciones especiales de dicho cruce demandaban. Hemos visto que la corte inferior declara que la demandada tocó los pitos de costumbre, y siendo éste uno de los deberes que le impone el inciso q del artículo 3 de la citada ley, suponemos que al decir que no se dió aviso conveniente y adecuado a Francisco Olmeda se refiere a las demás precauciones que deben adoptar las compañías ferroviarias de acuerdo con el artículo mencionado.

La negligencia atribuída a la demandada por haber dejado de colocar cadenas y adoptar otras precauciones en el cruce ha sido ampliamente discutida por las partes, alegando los demandantes que la compañía tenía el deber de cumplir con las disposiciones de la ley, y sosteniendo la demandada que aún no había surgido este deber.

A nuestro juicio el deber de mantener protegidos los cruces en los caminos públicos por las compañías ferroviarias es anterior a la Ley No. 70 aprobada en diciembre 6 de 1917 ( [2] pág. 433). Nuestra Asamblea Legislativa, al decretar dicha ley, incorporó en la misma principios de seguridad pública reconocidos y establecidos para proteger la vida de los ciudadanos. La carretera en cuestión, que es conocida con el No. 39, se extiende de San Germán a Guánica y una parte de ella se dirige de Lajas hasta más allá del cruce en que ocurrió el accidente. Se ofreció prueba para demostrar que esta carretera fué construída y se hizo pública allá para el año de 1914 ó 1915. La colisión ocurrió en 1928. La corte inferior, en su opinión, declara de conocimiento judicial la existencia de una carretera pública que cruzaba la vía en aquel sitio. Alega la apelante con marcado énfasis que de conformidad con los artículos 6 y 34 de la ley de 1917 no podía imponérsele el deber de tener determinada protección en el cruce hasta que la carretera fuese declarada pública por la Comisión de Servicio Público y se notificara a la compañía ferroviaria. Nada hay en la ley, a nuestro juicio, que impida que una carretera adquiera el carácter de pública sin la sanción de la mencionada comisión. La evidencia aportada, así como las fotografías, tienden a demostrar que la carretera era pública. Incidentalmente la demandada sostiene que únicamente la Comisión de Servicio Público tenía autoridad, de conformidad con la sección 34, supra, para obligar a la demandada a mantener protección especial en determinados lugares, y después de una declaración de necesidad y conveniencia, permitir que una carretera pública cruce la vía de una compañía ferroviaria. (Artículo 6 de la ley citada.) No estamos de acuerdo con la apelante. Cuando los hechos demuestran que la carretera ha adquirido el carácter de pública, la compañía ferroviaria no puede alegar la falta de actuación por parte de la comisión para evadir los deberes que le impone la ley y que exigen la seguridad y la protección de las personas que caminan por la carretera y atra-

viesan el cruce. Una carretera pública puede surgir sin necesidad de que así lo declare la Comisión de Servicio Público. La carretera en cuestión era la arteria principal entre Lajas y los demás lugares en dirección a Guánica. Los automóviles necesariamente tenían que pasar con frecuencia por ella. La prueba tendió a demostrar que el Departamento del interior, mucho tiempo antes de ocurrido el accidente, había construído esta carretera y la había considerado como pública, y así se entendió generalmente por el público.

El hecho de que los apelados trataron de probar el carácter público de la carretera, pudiendo descansar en el conocimiento judicial de la corte, como ocurrió en el caso de *Príncipe* v. *American Railroad Co.*, 22 D.P.R. 302, no debilita su contención. Los hechos establecidos demuestran la naturaleza pública de la carretera.

 El artículo 34 de la Ley No. 70 de 1917 dispone en parte lo que sigue:

"La Comisión tendrá exclusivo poder para determinar, ordenar y prescribir de acuerdo con los planos y especificaciones que ella aprobare, la forma justa y razonable, incluyendo el punto determinado de cruces, en que las vías u otras facilidades de cualquier compañía de servicio público puedan ser construídas a través de las vías u otras facilidades de cualquier otra compañía de servicio público a nivel, sobre o bajo nivel, o a los mismos o distintos niveles; o la forma en que las vías u otras facilidades de cualquier compañía de ferrocarril o compañía de ferrocarril urbano puedan construirse a través de las vías u otras facilidades de cualquier otra compañía de ferrocarril o de ferrocarril urbano, o a través de cualquier camino público, a nivel, sobre o bajo nivel; o la forma en que cualquier camino público puede ser construído a través de las vías u otras facilidades de cualquier compañía de ferrocarril o de ferrocarril urbano a nivel, sobre o bajo nivel; y para determinar, ordenar y prescribir los términos y condiciones de la instalación y explotación, conservación y protección de todos aquellos cruces que en la actualidad y en lo sucesivo se construyeren, incluyendo la colocación de un celador en los mismos, o la instalación y reglamentación de luces, señales de obstrucción u otros sistemas de señales, aparatos de seguridad, o los demás medios o instrumentos que la Comisión considerare razonables y necesarios, con

el fin de que se eviten accidentes y se fomente la seguridad del público.

"Ninguno de dichos cruces será construído sin la aprobación de la Comisión evidenciada por un 'certificado de conveniencia pública', según se dispone en esta Ley; pero en ningún caso será necesaria para ello la aprobación o el consentimiento de ninguna corte, junta u otra comisión o funcionarios, o de ningún municipio. Sin embargo, será propio que la Comisión, mediante regla u orden general, siempre que pueda propiamente reglamentarse por una regla general adecuada, prescriba los términos y condiciones de acuerdo con los cuales dichos cruces pueden ser construídos, explotados, conservados o protegidos, sin la aprobación particular de la Comisión.

"La Comisión tendrá también poder exclusivo, de oficio o mediante querella y después de celebrar audiencia según más adelante se dispone (de la cual se dará debido aviso a todas las partes interesadas, incluyendo a los dueños de propiedad adyacente), para ordenar que cualquiera de los antedichos cruces, ahora existentes o que en lo sucesivo se construyeren, sean resituados, alterados, o abolidos de acuerdo con los planos y especificaciones que deberán aprobarse, y en los términos y condiciones justos y razonables que se prescribieren por la Comisión."

No tiene este artículo el alcance que le atribuye la demandada al sostener que un cruce público sólo puede surgir mediante el consentimiento de la comisión. Al igual que los suburbios, una carretera pública puede surgir mediante los actos del público que transita por ella, especialmente cuando intervienen, como en el presente caso, funcionarios que tienen alguna autoridad emanada del poder legislativo. El artículo 6 de la citada ley no milita en contrario. En 1913 se aprobó la ley que concedió autorización al Comisionado del Interior para actuar y construir la carretera. Las compañías ferroviarias están obligadas a colocar barreras o cadenas u otros medios adecuados de protección en todos los cruces por una carretera pública o insular y es indudable que la demandada fué negligente al dejar de cumplir con estos requisitos de seguridad y protección. No podemos aceptar la contención de la compañía de que ha sido privada de su propiedad sin el debido proceso de ley, por el hecho de que la corte inferior

haya declarado que existe un cruce de vía férrea con carretera pública insular en el sitio del accidente. La conclusión de la corte no priva a la demandada de ninguna propiedad.

Los errores quinto, sexto, séptimo y octavo se relacionan con la obstrucción de la vía y la declaración de la corte inferior de que el *chauffeur* no podía ver la aproximación del tren al acercarse y cruzar dicha vía. Estos errores están íntimamente relacionados con la cuestión de negligencia contribuyente alegada por la demandada y serán discutidos oportunamente en relación con esta alegación.

No es necesario tampoco discutir separadamente el noveno error, consistente en haber declarado la corte *a quo* que la demandada dejó de dar aviso conveniente y adecuado al *chauffeur* Francisco Olmeda.

Se alega que lo dicho en el caso de *Nashville Chattanooga St. Louis Railway Co. v. R. D. White,* 278 U. S. 456, no afecta la doctrina sentada en *Goodman v. Baltimore & Ohio R. R. Co.,* 275 U. S. 66, 72 L. Ed. 167, y que la corte inferior cometió error al interpretar la opinión emitida en el primero de dichos casos, haciéndola aplicable al presente. Este es el décimo señalamiento de error. En el error próximo se alega que la corte inferior no debió dictar sentencia a favor de los demandantes, por ser éstos culpables de negligencia contribuyente y ser esta negligencia la causa próxima e inmediata del accidente.

A nuestro juicio el caso de Goodman no debe interpretarse en el sentido de imponer al conductor de un vehículo de motor el deber de detenerse siempre al acercarse a una vía ferroviaria. No parece razonable exigir invariablemente, en todos los casos, de un conductor, que se detenga por completo antes de llegar a la vía de un tren. La jurisprudencia general no sostiene tal criterio. Háse dicho por un número de tribunales que una persona que se dispone a cruzar la vía de un ferrocarril, manejando un vehículo de motor, debe detenerse, mirar y tratar de escuchar, en un sitio desde donde pueda tender la vista a través de la vía, para ver si se aproxima algún

tren. Prevalece, sin embargo, la regla de que, como cuestión de derecho, no es éste un deber que se impone invariablemente al viajero. Las cuestiones en controversia no son siempre las mismas, los hechos varían, y, para juzgar la conducta de un viajero que no haya detenido su vehículo, hay que tener en cuenta las circunstancias que mediaron al acercarse al cruce, su ignorancia o conocimiento de la situación de la vía y la confianza que haya podido tener en sus oportunidades para ver y oír, a un lado y otro de esa vía. Ya hemos dicho que cada caso tiene sus peculiaridades, sus rasgos característicos, su sello especial, su fisonomía propia, y que no sería empresa fácil impartir justicia si para apreciar qué hechos constituyen cuidado ordinario o negligencia tuviésemos que ajustarnos a reglas fijas e invariables. *Rivera* v. *Central Pasto Viejo,* 44 D.P.R. 266 y 267. Para determinar si ha habido o no negligencia en un caso determinado debemos preguntarnos qué hubiera hecho una persona de razonable prudencia en igualdad de circunstancias. No debemos esperar de la naturaleza humana más de lo que humanamente puede dar y no parece razonable exigir precauciones que no se adoptan en el curso ordinario de las actividades humanas, por más que estén justificadas cuando existe alguna razón especial que nos aconseje desplegarlas, velando por la seguridad ajena y por nuestra propia seguridad.

La cuestión a resolver es si, de acuerdo con los hechos probados, es éste un caso en que ha debido ejercerse o no un cuidado especial por parte del conductor del camión, Francisco Olmeda, al aproximarse y disponerse a cruzar la vía. Declara este demandante que al pasar la vía de Guánica en dirección a Lajas, chocó con un tren que venía de Lajas para Ponce; que ha pasado tres o cuatro veces por ese sitio, pero no en momentos en que cruzaba un tren; que no se paró en ningún momento antes de llegar a la vía; que venía bajando en segunda; que sabía que había allí una vía de ferrocarril y que no había cadenas o guardabarreras en la misma; que no había visto que pusieran cadenas otras veces que había

pasado por allí. Hemos examinado detenidamente la declaración de este testigo y en ninguna parte dice que haya mirado a un lado y otro de la vía y que haya tratado de mirar y escuchar. Se limita a decir que no oyó aviso de la aproximación del tren y que lo vió cuando estaba encima, en el momento del choque, y que no paró y se detuvo antes de cruzar la vía porque no vió aviso alguno que impidiera el paso.

Los demandantes alegan que el *chauffeur* no tuvo nunca oportunidad de cruzar la vía en momentos en que pasaba un tren y que por lo tanto no podía saber si la compañía dejaba de observar el estatuto de seguridad y no adoptaba las precauciones exigidas por la ley. Es claro que para saber si había cadenas o guardabarreras en el cruce, el conductor del camión no necesitaba aproximarse al mismo en momentos en que pasaba un tren.

La corte declara en sus conclusiones de hecho que la vista de las vías de la demandada estaba totalmente obstruída y que el conductor del camión, Francisco Olmeda, no podía, como no pudo, haber detenido la marcha del *truck* y pararse a observar desde un sitio lejano si se acercaba o no el tren de la demandada. En cuanto a la obstrucción de la vía, el ingeniero Etienne Totti, empleado de la corporación demandada, declara que una persona a dos metros de distancia de la vía puede ver cien metros y que a una distancia de tres metros un tren que corre de la estación de Lajas hacia Guánica puede ser visto a ochenta metros antes de llegar al cruce. Añade que una persona que vaya en un *truck* y que no se apee del mismo, si se sitúa a tres metros de distancia de la vía, puede ver ochenta metros de la misma quizás con más facilidad, porque está más elevada. Este testimonio no aparece contradicho, a no ser que se considere en conflicto con el mismo la manifestación del testigo de los demandantes, Antonio Vargas, quien declara que se encontraba como a veinticinco o treinta metros del cruce y que "como ahí queda reducido, tapado con las cuatro esquinas, vió cuando salió el tren y le dió por la parte derecha al *truck*." Nótese, sin

embargo, la diferencia entre el testimonio de uno y otro testigo en cuanto a la distancia. Totti declara que la vista podía abarcar 80 metros de vía a una distancia de 3 metros del cruce, mientras que Vargas se encontraba, según su testimonio, a 25 ó 30 metros del mismo. Las fotografías del sitio, admitidas como prueba, no parecen demostrar una obstrucción completa. Es un hecho admitido por ambas partes que la vista estaba obstruída. Los demandantes alegan que se trata de una obstrucción total; la demandada, basada en la declaración del ingeniero Sr. Totti, y en las fotografías mencionadas, sostiene que una persona que se sitúa a tres metros de la vía puede ver un tren que se aproxima, a una distancia de ochenta metros antes de llegar al cruce.

La corte inferior apreció los hechos y dictó sentencia a favor de los demandantes, declarando que Olmeda no fué culpable de negligencia contribuyente. De los hechos surge, a nuestro juicio, como una cuestión de derecho, la negligencia contribuyente de este demandante. Sus propias manifestaciones demuestran que conocía el cruce y sabía que no había allí barreras ni cadenas. Se ha demostrado que la vía estaba obstruída y se ha declarado por el ingeniero Totti, sin que su testimonio haya sido contradicho, que podía verse a tres metros de la misma. Las circunstancias que concurren en este caso demuestran, en nuestro sentir, que debió ejercitarse por el conductor del vehículo un cuidado especial al aproximarse al cruce. No parece, sin embargo, que el conductor del camión ejercitase ninguna otra precaución que la de caminar a una velocidad de seis millas por hora, sin que aparezca que mirase a un lado y otro de la vía y que tratase de mirar y escuchar. Conviene tener en cuenta que el camión iba bajando una pendiente para aproximarse al cruce y que según declara el testigo de los demandantes, Cornelio Cruz, el *truck* hacía bastante ruido en la transmisión.

No compartimos el criterio de la corte sentenciadora en cuanto a la negligencia exclusiva de la demandada. Opinamos que la conducta de Francisco Olmeda, dejando de adoptar

precauciones aconsejadas por la prudencia, constituyó un factor sustancial y jugó un papel importante en la producción del accidente.

La corte inferior declara en su opinión que aun cuando el demandante Francisco Olmeda hubiese sido culpable de negligencia contribuyente, esta negligencia no podría imputarse al demandante Pedro Mercado ni a Ernesto Rodríguez Feliú, hijo de la demandante Rosa Feliú, ni a Fernando García, dueño del camión. La apelante considera equivocada esta apreciación en el duodécimo de los errores señalados. Arguye la apelante que Pedro Mercado, que seguía el autocamión con un calzo para colocarlo debajo de las ruedas e impedir que el carro retrocediera, se montó nuevamente en el vehículo antes de que el camión llegara a la vía. No vemos cómo puede imputarse negligencia contribuyente a Pedro Mercado, quien no podía anticipar que Olmeda, que guiaba el autocamión a una velocidad moderada, no habría de detenerlo antes de llegar a la vía. Ernesto Rodríguez estaba sentado al lado del conductor del vehículo. No hay prueba alguna en los autos tendente a demostrar que este pasajero fuese culpable de negligencia. Ni siquiera se probó que conociese la vía y que tuviese conocimiento de que no había cadenas, guardabarreras o cualquier otra protección en la misma.

En el caso de *Domínguez* v. *P. R. Ry., Light & Power Co.*, 19 D.P.R. 1097, esta corte se expresó así:

"Mientras la regla general establecida por las decisiones en Inglaterra fué que la negligencia del conductor sería imputada a un pasajero en accidentes causados por la negligencia de un tercero a la cual contribuyó el conductor, y que esta doctrina fué adoptada por unas pocas decisiones inglesas y americanas, sin embargo, tales decisiones han sido expresamente rechazadas luego en Inglaterra y desaprobadas por la Corte Suprema de los Estados Unidos en el caso de Little v. Hackett, 116 U. S. 366; 6 S. Ct. 391; 29 L. Ed. 652, siendo hoy la regla general que la negligencia del conductor no será imputada al pasajero cuando no tenía gobierno sobre dicho conductor. Es cierto, según sostiene la corte inferior, que como

excepción a esa regla general la negligencia del conductor puede ser imputada al pasajero, cuando teniendo éste oportunidad de descubrir y evitar el peligro mediante el ejercicio de un cuidado ordinario no lo descubre o evita, mas para que podamos llegar a la conclusión de que la negligencia del *chauffeur* que conduce un automóvil pueda ser imputada al pasajero que viaja en un asiento de la parte trasera, es necesario que el demandado pruebe que las circunstancias fueron tales que el apelante tenía el deber de estar atento durante el viaje al paso a nivel existente en la carretera. No creemos que el solo hecho de que el demandante conocía la existencia de tal paso a nivel le impuso el deber de estar atento a él y de avisar al conductor del automóvil. El apelante aunque viajaba con un *chauffeur*, desconocido para él, tenía derecho a esperar que fuera precavido y prudente como la mayoría de los hombres y a confiar en su habilidad en el manejo del carro, siendo por otra parte muy difícil en tal clase de vehículos, conocer en un momento determinado, si un peligro puede evitarse o no con la rapidez en la marcha. El apelante comenzaba su viaje con ese *chauffeur* y no se ha demostrado que hasta el momento del choque por el que reclama, hubiera ocurrido algo que pusiera en duda su pericia o su prudencia. No creemos que el apelante estaba obligado a vigilar todos los peligros que podían existir en el camino, ni aun los que conocía, y que debiera llamar la atención sobre ellos en cada caso al conductor. Tampoco creemos que la regla de que el pasajero pudo ver y oír sea tan estricta que necesariamente haya de deducirse siempre que el pasajero vió y oyó, si no se prueba que en efecto miraba hacia el sitio peligroso.''

De la opinión emitida por la Corte Suprema de California en el caso de *Marchetti* v. *Southern Pac. Co.*, 269 Pac. 530, copiamos lo siguiente:

''La opinión de la corte sentenciadora, concediendo una moción de *nonsuit*, ha sido transcrita en los autos en toda su integridad. Aparece por lo tanto que la orden fué concedida solamente sobre la base de que la evidencia demostraba que el finado fué culpable de negligencia contribuyente, siendo esta negligencia la causa próxima de su muerte. Opinamos que la corte incurrió en error. La evidencia sobre este punto no ha sido contradicha. El finado viajaba acompañando a Connors bajo la dirección de éste, y no tenía dominio alguno sobre el manejo del automóvil en el cual ellos viajaban. No hay duda alguna acerca de la negligencia de Connors al penetrar con su máquina en el cruce del tren sin tomar las precauciones debidas para observar si un tren se aproximaba o no. La negligencia

del conductor de una máquina, sin embargo, no puede ser imputada a un pasajero en ausencia de cualquier evidencia que demuestre que el último ejercía algún dominio sobre el conductor o que poseía el poder de vigilar o dirigir la forma en la cual el automóvil sería manejado. Bryant v. Pac. Electric Ry. Co., 174 Cal. 737, 164 Pac. 385; Irwin v. Golden State Auto Tour Corp., 178 Cal. 10; 171 P. 1059; Nichols v. Pac. Electric Ry. Co., 178 Cal. 730, 174 Pac. 319. En este caso no hubo tal evidencia. El finado, como anteriormente hemos dicho, caminaba simplemente con Connors en la máquina del último, con el propósito de ocuparse en algunas cuestiones de negocios relacionadas con la propiedad de sus patronos. Connors era el capataz de su patrono y el muerto estaba bajo sus órdenes. Connors tenía el dominio completo de la máquina y manejaba la misma sin ninguna ayuda o dirección de parte del finado. Si el finado, por lo tanto, fué culpable de negligencia contribuyente, tuvo que serlo por algún acto ya de comisión u omisión, que por sí mismo constituyera negligencia contribuyente. No hubo evidencia en el caso tendente a demostrar tal acto de negligencia de parte del finado. Todos los testigos convienen en que dicho finado estaba simplemente sentado en la máquina al lado de Connors y que miraba hacia adelante mientras ambos viajaban por la calle A y antes que ocurriera la colisión de su máquina con el tren de la demandada. Ningún testigo declaró, ni hay evidencia de la cual pueda inferirse, que el finado ejerció o intentó ejercer dominio o dirección alguna sobre el manejo del automóvil por Connors.''

En el caso de *Cunningham* v. *St. Louis,* 9 S. W. (2d) 166, la corte se expresó así:

''Tócanos ahora resolver la cuestión de la negligencia contribuyente de Mattie Cunningham. Puesto que ella era un pasajero en el automóvil no estaba obligada a usar el más alto grado de cuidado, como lo estaba el conductor, sino solamente aquel cuidado que una persona de prudencia ordinaria ejercería bajo las mismas o parecidas circunstancias. Asumiendo para el propósito de este caso que el conductor fué negligente al intentar cruzar la vía enfrente del tren que se aproxima rápidamente, que estaba plenamente a la vista, no puede atribuirse a ella la negligencia del conductor. Nuestra Corte Suprema ha dicho:

'Estamos completamente de acuerdo con la doctrina de que el pasajero de un vehículo no puede abandonar el ejercicio de sus propias facultades y confiar su seguridad absolutamente al conductor, sin preocuparse de la inminencia del peligro o la visible carencia de or-

dinario cuidado de parte del conductor para evitar daño. . . Sin embargo, es una cuestión de conocimiento común que en circunstancias ordinarias tales pasajeros corrientemente confían en el conductor que tiene el exclusivo dominio y manejo del vehículo, ejerciendo el grado de cuidado necesario, y por esta razón las cortes no están justificadas en adoptar una regla invariable de que dichos pasajeros sean culpables de negligencia al hacerlo así. Cada caso debe depender de sus propios hechos especiales.' ''

Descartamos la contención de que Mercado y Olmeda podían obtener indemnización de su patrono o de la Comisión Industrial de acuerdo con la Ley de Indemnizaciones a Obreros. La ley no exime a un tercero de sus actos de negligencia ni prescribe un remedio exclusivo ante la Comisión Industrial en casos como el presente.

Los demás señalamientos de error se relacionan con la cuantía de los daños y perjuicios concedidos a cada demandante por la corte inferior y con la condena en costas a la parte demandada. Opinamos que las indemnizaciones no son excesivas y aceptamos la apreciación de la corte inferior en tanto y en cuanto se confirma la sentencia apelada.

En cuanto al fallo sobre las costas, entendemos que debe subsistir en los casos de Pedro Mercado y Rosa Feliú, conforme al pronunciamiento de la corte de distrito.

De acuerdo con las razones anteriormente expuestas, consideramos probada la negligencia de la corporación demandada y resolvemos que Francisco Olmeda, culpable de negligencia contribuyente, no puede obtener indemnización alguna, al igual que su patrono Fernando García, toda vez que Olmeda estaba en gestiones de negocio de este último. En lo que a esos dos demandantes concierne, las sentencias deben ser revocadas, y confirmadas en cuanto a Pedro Mercado y Rosa Feliú, madre de Ernesto Rodríguez.

El Juez Presidente Señor del Toro disintió en cuanto a la revocación de las sentencias dictadas en los casos de Fernando García y Francisco Olmeda.